You're going to hear the first two cases, then take a very brief five-minute break and come back and hear the third case on the calendar. The court clerk has apprised me that everybody is here, which is good. So I think we're ready to begin. Thank you, Your Honor. My name is Brian Lehman. I represent the appellants in 33 Seminary. May it please this Court. I think like all summary judgment cases, there's legal issues and there's factual issues here. The specific legal issue that I think is the strongest for appellants is that the district court applied too strict of a standard for the similarly situated test. And I think that this goes back to really what the purpose of the Equal Protection Clause is, which is to prohibit the government from acting in illegitimate ways. Now, most often we think of this as race or gender, but there is a long line of prohibits the government from acting in illegitimate ways, even when it's just based on something like parking, as in this case, or animus towards the managing member, Isaac Levin. And in fact— What animus do you have of the ZBI, the Zoning Board of Appeals? I think as far as—you mean the specific evidence of animus towards them? I think comments like, I would rather swallow a frog than do anything to help out Isaac. Now, the appellant in the case is an LLC. It's not Isaac. But in the record, I think they very closely associate Isaac with the LLC. In addition, there was other things like the fact that they arrested him. The—Isaac Levin had purchased five homes. And on one of those homes, they arrested him four times, and they arrested his wife once. And I think that they arrested her on felony charges based on a doctored document. And what I mean by doctored, I don't mean that as some nefarious thing. They literally just added a name to it before they arrested Isaac. Other evidence would be, as far as animus goes, I think that's where the simile situated test comes into play. Because when you look at other houses that have been granted variances, the simile situated test is designed to figure out whether or not there's animus or the government's just acting arbitrarily towards him. In this case, what happened, right, is he wants—he purchases a house at 26th Seminary. He wants to use it for three units. Back then, they actually called it three families. So if you look at a letter in 2007 that David Chadwick gave to Mr. Levin saying that he could build here, it calls it a three-family house. But that's not—I don't think that that's anywhere in the statute. I think what they really are is units. Back then, they just thought families and units were the same things. But you have a rising student population that's coming into the area, and so now they're all becoming units. In the same way, when I was in school, I lived with—at the University of Michigan, I lived with five other people in a house. We were a unit. And I think that that's where the statute began to have openings for someone like Isaac Levin to come in and purchase it and make money off of it. In 2009, everyone started to pick up on the fact that students were beginning to move into the area. So that's when they passed the new statute that requires everyone to have certain kind of parking requirements for it. He then saw—yes? I have some re-judgment on the class of one claim that you're asserting. A plaintiff has to make some showing that similarly situated individuals, or in this case, properties, were treated differently. And so could you explain how that works with regard to, I guess, 63 Front Street and 46 Seminary? Yes. We are required to show that similarly situated people—and there's two elements, right? One is that they're similarly situated people who were treated differently, and the other was the reason for this was not based on any legitimate government purpose. It might have been animus, it might have just been arbitrary, someone might have just flipped a coin. As far as 63 Front Street, that is a house that was in a different zoning district. C-5, I think, yeah. With offices. Yes, with offices. We looked at that. If you look at the map, it's like three blocks away. So as far as the impact of parking on the neighborhood, the reason why that was selected is because it would have been similar in terms of the neighborhood. But it's in a different use. I agree. So you're hard-pressed to say it's a comparative, aren't you? Except that we would say that you need to measure it with respect to parking. In other words, when you measure similarly situated, you're not measuring it with respect to are they similar in all aspects or even what we would consider the most— 63 Front Street, they required him to go get an additional parking space 500 feet within the area of the property. That's right. They required him to sign a lease with, I think, Broome's Garage or something like that. My client offered to have six parking spaces put, and a property was half a block down the street. How many people were going to be living in the three units? There was three units and five rooms in each. It is fluctuated. A lot more in terms of number of spaces per person than what was evident in 63 Front Street. Well, 63 Front Street was eight bedrooms. I don't know that they just had eight members of the fraternity living there. They could have had two or three in each room, which would be quite common in a college setting. In addition, I assume that if they're like any fraternity I've been around, they have more influx of parking problems during that time period. Going back to Your Honor's question as far as the similar situation, one point that we press is it has to be measured with respect to parking. It's not whether or not, oh, this is a fraternity and it's on Fraternity Row, or this is a restaurant and it's on Restaurant Row. Correct me if I'm misremembering the record, but before the Zoning Board of Appeal, as part of the original plan, your client wasn't offering any parking. Isn't that right? Prior, I mean prior to 2009, he wasn't required to. They literally passed a law after he purchased it and said, now you need to get parking. So he had already bought a property where there was no parking requirement. He bought a property that had a commercial use on the front ground floor, and then he converted it after he knew, or he sought to convert it after he knew what the parking requirements were. Yeah, that's absolutely. So, I mean, that doesn't matter what the parking was before he bought it, and then he made an application to change the use and he knew what the requirements were. Well, in 2007, so the statute was passed in 2009. In 2007, when he went to David Chadwick to get the letter, David Chadwick wrote in his letter that it was a legal, non-conforming use for a three-family unit. So they had noticed that that was going to happen. They knew that it was going to switch from a commercial space down below and two units above to three units. And they gave him the letter, and that's the basis on which he got the $100,000 loan from the bank. But in addition, Your Honor, one point to emphasize is that if they're concerned about parking here, going from a commercial space to a unit space requires less parking. And we laid that out in our reply brief when I go through the math, right? A commercial space with two units requires 11 parking spaces. His only required seven. So this emphasis that he is somehow birdying the neighborhood by not doing a commercial space is arbitrary or at least illogical because it would have required 11 parking spaces, which, by the way, would have had to be entirely waived had he just done the exact same use because there is no parking. The building goes all the way up to the boundary, and it's been like that, I think, for decades. There's no way anyone purchasing that. And that does go back to 63 Front Street. If you look at some of the concerns that the city had on 63 Front, one of the things they're concerned about is that that house has not been used for a decade. But they didn't show the same type of concern for Mr. Levin or 26th Seminary, that this is a vacant house that no one's buying. And in fact, if they were to strictly apply the law, no one could ever buy it unless they just tore it down. So I'll wait for my rebuttal. Thank you. Good morning, ma'am. Police, the court. I'm here on behalf of the defendants of Pelley's. First with respect to, I'm going to start with the letter from Mr. Chadwick in 2007, which referred to the property as a legal non-conforming three-family dwelling. At the time that letter was written, there were three dwelling units in that property on the second and third floor. There were two apartments on the second floor, correct, one on the third floor was commercial. So what triggered the need for the site plan to be submitted and the approval of the planning commission was the proposed conversion of the first floor from commercial to residential. With respect to this selective enforcement similarly situated, the plaintiffs were the ones who chose these particular properties. The Front Street property, as the court has already noted, originally submitted an application for five parking spaces but they were too narrow, then went back, resubmitted an application and this time it was for four compliant spaces and then they got a lease with an adjoining property 500 feet away to provide the other required space. The other property was commercial property, 46th Seminary. That was denied, the denial would have resulted in economic deprivation, it's also another use, plus it was noted that the proposed project for that property was actually going to create additional parking, which would obviate any issue. Correct, and provide additional parking. The council noted that at one point there was a proposal, Mr. Levin had proposed that he was going to provide some parking spaces at another property and that was 31th Seminary, but by the time this proposal was submitted to the ZBA that was not possible and it was known that it wasn't possible. With respect to the ZBA, there was no proposal for parking at all? Correct, the proposal was for a complete area variance. He wanted approval of no parking spaces. There was never any offer of a compromise or an alternative plan for fewer spaces. The second prong of the selective enforcement test is this animus or bad faith. And following up on what Judge Droney asked about, there were a couple of statements in the record regarding some possible hostility toward Mr. Levin individually. Those were not quotes that were taken from people who were on the ZBA. There were a couple of quotes that were attributed in the appellee's brief to people who were on the planning commission, but the area variance, the proposal was submitted to the ZBA and it was the ZBA that had to vote on it, not the planning commission. I guess unless there are any other questions. Thank you. That's one way to curry favor, I imagine. My opposing counsel, she mentioned two things. One was the economic deprivation at 46 Front Street, which became a restaurant. I think under the way the law is written, it actually requires more parking, not less. So you're talking about a building that's coming in as a residential one and then being made into a restaurant, that requires more parking. And yet the thing that they're concerned about is economic deprivation. They showed none of that concern for Mr. Levin or 26th Seminary. The way it stands now, the house is completely unusable. Every dollar is invested will go to waste. The second thing was she talked about the quotes that were from some of the people. That is true. They weren't on the way the board is set up. I think they have 15 people and they rotate through. We're talking about Young, Renia, and Pompey. Those are where the quotes come from. Yes, Your Honor. In the restaurant case, the 1994 case, I think that we relied the most heavily on and we would argue is the reason why it should be remanded back to the district court for consideration or reversed in light of that case, holding that we have enough evidence to go to a jury. In that restaurant case, there were other actors such as the mayor who was outside protesting, but he wasn't directly related to the police who were cracking down or to the legislature in that case who passed the new law. I think the concept there is that, under summary judgment, inferences are supposed to be drawn in our favor. In a small town like Binghamton, where you have 40,000 people, it's reasonable to infer at the summary judgment level that people were talking with each other, that they knew each other, that the former city council member was in the same neighborhood with the people who were ... The fact that someone else might have animus doesn't mean that somehow they infected the rest. That's right. It doesn't mean it, but ... In a small town of 1,400, we talked to each other a lot, but because some of my friends talked foolishly, that doesn't ... Hopefully that means I don't talk foolishly. I agree, Your Honor. Thank you both for your arguments.